UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF NEW YORK

BRUCE BUSKE,

                              Plaintiff,


                                                    **REPORT AND RECOMMENDATION**
                                                      **5:07-CV-0120 (DNH/VEB)**

MICHAEL J. ASTRUE,[1]
COMMISSIONER OF SOCIAL SECURITY,

                              Defendant.


# Jurisdiction

1.      This case was referred to this Court by Chief Judge Norman A. Mordue, pursuant

to 28 U.S.C. § 636(b) and Northern District of New York Local Rule 72.3.  This case has

proceeded in accordance with General Order 18 of this Court which sets forth the

procedures to be followed when appealing a denial of Social Security benefits.  Both

parties have filed briefs.  For the reasons discussed below, I recommend that the matter

be remanded for further proceedings.


# Background

2.      Plaintiff Bruce Buske challenges the Administrative Law Judge's ("ALJ")

determination that he is not entitled to disability insurance benefits ("DIB"), under the

Social Security Act ("the Act").  Plaintiff alleges that he was disabled from June 2, 1999,

through December 31, 2001, because of injuries to both shoulders, back pain, and

---

[1] On February 12, 2007, Michael J. Astrue was sworn in as the Commissioner of the Social Security
Administration.  Pursuant to Federal Rules of Civil Procedure 25(d)(1), he is automatically substituted for
former acting Commissioner Linda McMahon as the defendant in this action.

diabetes.  In denying Plaintiff's claim, the Administrative Law Judge ("ALJ") found that during the time period in question, Plaintiff was able to perform various sedentary jobs, and therefore, was not entitled to DIB (R. at 26-27).[2]  Plaintiff has met the disability insured status requirements of the Act at all times on or before the date of the ALJ's decision.


## Procedural History

3.      On September 5, 2000, Plaintiff filed an application for DIB alleging an onset date of June 2, 1999 (R. at 67).  This application was denied both initially and upon reconsideration (R. at 36, 38).  Following a hearing, the ALJ issued a decision on February 19, 2002, in which he found Plaintiff had not met the requirements for disability (R. at 305-313).  Plaintiff requested review by the Appeals Council on February 22, 2002 (R. at 314-322).

        While awaiting the results of his administrative appeal, on June 13, 2002, Plaintiff filed a second application for benefits (R. at 21).  The Social Security Administration determined on October 9, 2002, that Plaintiff met the requirements for disability and established February 20, 2002, the day after the decision date of his first application, as his disability onset date.  Id.

        On April 24, 2003, the Appeals Council remanded Plaintiff's first application; a new hearing was held on November 3, 2003 with a subsequent hearing on December 13, 2004 (R. at 459-510).  The ALJ considered the case *de novo*.  On January 6, 2005, the ALJ issued a partially favorable decision finding Plaintiff became disabled on

---

[2] Citations to the underlying Administration are designated as "R."

December 31, 2001, but was not disabled within the meaning of the Act prior to that date (R. at 21-27).   Plaintiff's request for the Appeals Council to review the decision was denied on January 12, 2007 (R. at 12).

4.      On February 1, 2007, Plaintiff filed a Civil Complaint challenging Defendant's final decision and requesting the Court review the decision of the ALJ pursuant to Section 405(g) and 1383(c)(3) of the Act, modify the decision of Defendant and grant DIB to Plaintiff for the period June 2, 1999 through December 31, 2001.[3]   Defendant filed an answer to Plaintiff's complaint on May 23, 2007, requesting the Court to dismiss Plaintiff's complaint.  Plaintiff submitted a Memorandum of Law (hereinafter called "Plaintiff's Brief") on July 9, 2007.  On September 25, 2007, Defendant filed a Memorandum of Law in Support of His Motion (hereinafter called "Defendant's Brief") for Judgment on the Pleadings[4] pursuant to Rule 12(c) of the Federal Rules of Civil Procedure.  After full briefing, the Court deemed oral argument unnecessary and took the motions under advisement.

## Facts

5.      Plaintiff's medical records[5] document that he suffers from various ailments, including bilateral upper extremity neuropathy[6] status post Neer decompression[7] of the

---

[3] The ALJ's January 6, 2005, decision became the Commissioner's final decision in this case when the Appeals Council denied Plaintiff's request for review.

[4] Although no motion for judgment on the pleadings was filed, the moving party was excused from such filing under General Order No. 18, which states in part: "The Magistrate Judge will treat the proceedings as if both parties had accompanied their briefs with a motion for judgment on the pleadings…"

[5] Plaintiff's medical records cover dates past when the ALJ deemed Plaintiff disabled, on December 31, 2001, therefore, this decision will focus on Plaintiff's medical history before that date.

[6] "[A] functional disturbance or pathological change in the peripheral nervous system…" *Dorland's Illustrated Medical Dictionary*, 1287 (31st ed. 2007).

right and left shoulders with left shoulder tendinitis/bursitis,[8] left foraminal lateral disc herniation[9] at L5-S1 and residuals status post acute anterolateral myocardial infarction[10] with two vessel coronary artery disease (R. at 26).

**Medical Examiners**

On March 8, 1995, Plaintiff saw Dr. Weichert, an orthopedic surgeon, for an August 26, 1994 work-related injury resulting in neck, back, and shoulder pain as well as decreased range of motion in his right shoulder (R. at 121, 276).  On August 3, 1995 Plaintiff had Neer decompression rotator cuff surgery on his right shoulder (R. at 121, 276).  On March 4, 1998, two and one half years after surgery, Dr. Weichert deemed Plaintiff's range of motion for his right shoulder "excellent," but Plaintiff complained he was still experiencing "snapping in his shoulder," especially when he raised his right arm over his head (R. at 129).  On October 27, 1999, Dr. Weichert diagnosed Plaintiff with a "mild permanent partial disability" in his right shoulder, with "almost full ROM"[11] and "minimal pain" (R. at 144).

During Plaintiff's March 4, 1998, consultation with Dr. Weichert, Plaintiff also complained of pain in his left shoulder (R. at 129).  On March 18, 1998, Plaintiff was diagnosed by Dr. Weichert with a "rotator cuff tear" in his left shoulder (R. at 130).  Plaintiff received Neer decompression surgery on his left shoulder in May 1998 but continued to feel pain and lacked about 30 degrees of full elevation on December 23,

---

[7] An operation to relieve pressure.  *Dorland's* at 482-483.

[8] "[I]nflammation of the bursa…." (A bursa is "a sac or saclike cavity filled with fluid...")  *Dorland's* at 266-267.

[9] "[T]he abnormal protrusion of an organ or other body structure through a defect or natural opening in a covering, membrane, muscle, or bone."  *Dorland's at* 862.

[10] "[Infarction] occurring during the period when circulation to a region of the heart is obstructed and necrosis is occurring;"  *Dorland's at* 948.

[11] Range of motion.

1998 (R. at 132-139). On February 3, 1999, Plaintiff injured his left shoulder in another work-related incident (R. at 276).  Dr. Weichert diagnosed Plaintiff with a tear of his rotator cuff on June 2, 1999, Plaintiff's alleged disability onset date (R. at 143).  Dr. Weichert's diagnosis was verified by an MRI.  Id.

Plaintiff had a second Neer decompression surgery on his left shoulder to repair the torn rotator cuff on March 9, 2000 (R. at 277).  On August 16, 2000, five months after surgery, Dr. Weichert deemed Plaintiff's range of motion "excellent," with "full side and forward elevation, internal and external rotation" (R. at 149).

Plaintiff began seeing chiropractor Franklin Perkins on September 6, 2000, and was diagnosed with chronic thoracic and lumbar sprains (R. at 229).  Perkins opined that Plaintiff could occasionally lift and carry five pounds, stand and/or walk less than 2 hours per day, sit less than 6 hours per day, and was not able to push or pull (R. at 234).

Plaintiff again saw Dr. Weichert on January 17, 2001 (R. at 263). Dr. Weichert noted that Plaintiff lacked full extension with his right shoulder by about 15 degrees anteriorly and 20 degrees laterally (R. at 263).  On April 11, 2001, Dr. Weichert evaluated Plaintiff's left shoulder and noted that Plaintiff can elevate 110 degrees, 130 degrees laterally, and has full internal rotation (R. at 234).  Dr. Weichert stated that Plaintiff "lost 20% ROM and functional 35% loss of ability to do those things that he did before his injury" in his left shoulder.  Id.

On February 9, 2000, Plaintiff met with Dr. Ghobraiel,[12] concerning an unintended twenty to thirty pound weight loss Plaintiff had experienced during the previous three to four months (R. at 150).  On February 15, 2000, Plaintiff was diagnosed with new onset diabetes mellitus[13] and was started on 5 milligrams of Glyburide[14] (R. at 151).  Plaintiff continued to see Dr. Ghobraiel and was diagnosed with anxiety and depression for which he was given Amitriptyline[15] on May 12, 2000 (R. at 154).  From March through October of 2000, Plaintiff also complained of epididymitis,[16] insomnia, lower back pain, loin pain, and abdominal pain (R. at 153-158).  Plaintiff was given Bactrim,[17] Levaquin,[18] Ambien,[19] Naprelan,[20] and Darvocet.[21]  Id.  On October 24, 2000, Dr. Ghobraiel suggested that Plaintiff would benefit from seeing a psychiatrist or psychotherapist[22] (R. at 158).

On June 20, 2000, Plaintiff was evaluated by the physical therapy department of the A. L. Lee Memorial Hospital in Fulton, New York (R. at 160).  Plaintiff complained of

---

[12] The record does not specifically state Dr. Ghobraiel's specialty, but it suggests internal medicine.  See, R. at 150-25 (Dr. Ghobraiel treated Plaintiff for his diabetes, epididymitis, and insomnia, as well as abdomen, lower back, and loin pain).

[13] Type 2 diabetes, generally treated through diet or an oral hypoglycemic.  Dorland's at 513.

[14]  A hypoglycemic, used to treat type 2 diabetes. Dorland's at 803.

[15] An antidepressant. Dorland's at 64.

[16] "[I]nflammation of the epididymis," "a cordlike structure along the posterior border of the testis…" Dorland's at 639.

[17] Trademark for trimethoprim and sulfamethoxazole, both are antibiotics. Dorland's at 196, 1828, 1994.

[18] Trademark for levofloxacin, an antibiotic.  Dorland's at 1045.

[19] Trademark for zolpidem tartrate, a sedative-hypnotic, used to treat insomnia. Dorland's at 58, 2120.

[20] Trademark for naproxen sodium, a non-steroid anti-inflammatory.  Dorland's at 1251.

[21] Trademark for propoxyphene napsylate, an opioid analgesic, and acetaminophen.  Dorland's at 479, 1551.

[22] The record does not indicate whether Plaintiff followed the recommendation and saw a psychiatrist or psychotherapist.

lower back pain and was diagnosed with sciatica[23] and two bulging discs in the lumbar spine.  Id.  Plaintiff continued physical therapy at Memorial Hospital through July 11, 2000, but stated only pain medications and a hot tub afforded him some relief (R. 160-167).  Plaintiff ended treatment with the physical therapy department on July 21, 2000, due to Dr. Greenky's[24] belief that his pain was the result of a problem with his pancreas (R. at 168).

On August 23, 2000, an MRI of Plaintiff's lumbar spine showed disc herniation at the L5/S1 level and a "minimal disc bulge" at the L3/4 level (R. at 178).

On December 6, 2000, Dr. Weichert began injecting Plaintiff with Depomedrol[25] and Lidocaine[26] to help ease the pain in his shoulders (R. at 376).  However, on November 14, 2001, Dr. Weichert discontinued the injections for fear that it would cause damage to Plaintiff's shoulders and referred Plaintiff to a pain clinic (R. at 378).[27]

On May 9, 2002, Dr. Desravines[28] began treating Plaintiff for the residuals from his December 31, 2001, heart attack as a requirement before Plaintiff was permitted to see a cardiologist (R. at 414, 490).  In treatment notes dated June 3, 2002, Dr. Desravines stated that Plaintiff had filled out a Department of Social Services ("DSS") report indicating that Plaintiff "could work full time but no heavy lifting" (R. at 415).

---

[23] Pain generally caused by the "protrusion of a low lumbar intervertebral disk; the term is also used to refer to pain anywhere along the course of the sciatic nerve."  Dorland's at 1703.

[24] Dr. Greenky is mentioned only one other time in the record, and not during the relevant time period (R. at 434).

[25] Trademark for methylprednisolone acetate, an anti-inflammatory and immunosuppressant; can be used for adrenocortical insufficiency.  Dorland's at 499, 1171.

[26] Can be used as an anesthetic, sedative, analgesic, anticonvulsant, and cardiac depressant.  Dorland's at 1048.

[27] The record does not indicate whether Plaintiff went to a pain clinic.

[28] The record does not specifically state Dr. Desravines' specialty, but it suggests internal medicine.  (R. at 412-425) (Dr. Desravines treated Plaintiff for his heart and diabetes).

However, on June 18, 2003, Dr. Desravines submitted a physical medical source statement ("MSS") indicating that Plaintiff could stand/walk less than 2 hours in an 8-hour work day, sit at least 6 hours in an 8-hour work day, frequently lift and carry 10 pounds, and rarely stoop or climb (R. at 381, 383, 384).  Dr. Desravines opined that these symptoms had existed since June 23, 2000 (R. at 385).

**Independent Medical Examiners**

Dr. Lopez, an independent medical examiner ("IME") for the Workers' Compensation insurance carrier, examined Plaintiff on September 7, 1999, for an orthopedic consultation (R. at 295).  On September 9, 1999, Dr. Lopez diagnosed right shoulder rotator cuff tear, left shoulder impingement[29] syndrome secondary to overuse, and a possible left shoulder rotator cuff tear (R. at 298).  Dr. Lopez opined that Plaintiff had "a moderate, partial disability," but could not comment on its permanency.  Id.

On June 7, 2000, Dr. Wilson, an IME for the Workers' Compensation insurance carrier, examined Plaintiff for an orthopedic evaluation (R. at 276).  Dr. Wilson opined that Plaintiff had a mild permanent partial disability involving both shoulders (R. at 279).  Dr. Wilson stated on June 18, 2001, after another examination, that Plaintiff had "a 15% schedule loss of use of his left arm" (R. at 293).

On September 25, 2000, Dr. Maun, an IME for the Workers' Compensation insurance carrier, found that, "[b]ased on the New York State Workers' Compensation Board Medical Guidelines… [Plaintiff's] condition is permanent and equal to a schedule loss of use of 15% of the left arm."  (R. at 274).

---

[29] "[T]he progressive pathologic changes resulting from mechanical impingement by the acromion, coracoacromial ligament, coracoid process, or acromioclavicular joint against the rotator cuff;"  *Dorland's* at 1859.

Plaintiff underwent a consultative physical and psychiatric evaluation on October 11, 2000, at the request of the Social Security Administration (R. at 191, 197). Consultative psychiatric evaluator, Kristen Berry, Ph.D., diagnosed Plaintiff with Axis I adjustment disorder with depressed mood and Axis III diabetes, back pain, abdominal tightness, breathing difficulties and left shoulder problems (R. at 191, 195).  Berry recommended that Plaintiff continue with his medical treatment and found that he had a fair to good psychological prognosis.  Id.  Plaintiff also met with consultative physical examiner, Dr. Ganesh, who diagnosed lower back pain, status post left shoulder decompression surgery, status post right rotator cuff surgery, and diabetes (R. at 200). Dr. Ganesh opined that Plaintiff had a "mild-to-moderate degree of limitation to sitting…. no gross limitation to standing, walking, or climbing…. [and a] moderate degree of limitation to lifting, carrying, pushing, pulling, and reaching" (R. at 200).

On January 8, 2001, Dr. Lopez again examined Plaintiff for the Workers' Compensation insurance carrier (R. at 435-437).  Dr. Lopez found that Plaintiff "ha[d] a schedule loss of 20% of his right arm secondary to a mild loss of the internal external rotation and forward flexion abduction" (R. at 437).

**RFC Analysis**

On November 27, 2000, Dr. Apacible, a non-examining review physician completed a psychiatric review technique (R. at 215).  In the review technique, he opined that Plaintiff had an adjustment disorder with depressed mood resulting in a "mild" restriction of daily living activities, "mild" difficulties in maintaining social functioning, and "mild" difficulties in maintaining concentration, persistence, or pace (R. at 225).

9

Also on November 27, 2000, Dr. Seok, a non-examining review physician, completed a residual functional capacity ("RFC") assessment for Plaintiff (R. at 207). Dr. Seok stated that Plaintiff could lift and/or carry 20 pounds occasionally, lift and/or carry 10 pounds frequently, stand and/or walk about 6 hours in an 8-hour workday and sit about 6 hours in an 8-hour workday (R. at 208).  Dr. Seok also stated that Plaintiff had an unlimited ability to push and/or pull.  Id.  Dr. Seok stated that Plaintiff should limit his climbing and stooping to occasionally, but Plaintiff had no manipulative, visual, communicative, or environmental limitations (R. at 209-211).

On February 9, 2001, Plaintiff's medical history was again reviewed by a non-examining physician, Dr. Siddiqi (R. at 238, 244).  Dr. Siddiqi opined that Plaintiff could occasionally lift and/or carry 20 pounds, frequently lift and/or carry 10 pounds, stand and/or walk 6 hours in an 8-hour workday, sit 6 hours in an 8-hour workday, and had no limitations to push and/or pull (R. at 239).  Dr. Siddiqi also stated that Plaintiff could only occasionally climb or stoop, but had no manipulative, visual, communicative or environmental limitations (R. at 240-242).

## Discussion

### Legal Standard and Scope of Review:

6.      A court reviewing a denial of disability benefits may not determine *de novo* whether an individual is disabled.  See 42 U.S.C. §§ 405(g), 1383 (c)(3); Wagner v. Sec'y of Health & Human Servs., 906 F.2d 856, 860 (2d Cir. 1990).  Rather, the Commissioner's determination will only be reversed if it is not supported by substantial evidence or there has been a legal error. See  Grey v. Heckler, 721 F.2d 41, 46 (2d Cir.

1983); Marcus v. Califano, 615 F.2d 23, 27 (2d Cir. 1979).  "Substantial evidence" is evidence that amounts to "more than a mere scintilla," and it has been defined as "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion."  Richardson v. Perales, 402 U.S. 389, 401, 91 S. Ct. 1420, 1427, 28 L. Ed. 2d 842 (1971).  Where evidence is deemed susceptible to more than one rational interpretation, the Commissioner's conclusion must be upheld.  See Rutherford v. Schweiker, 685 F.2d 60, 62 (2d Cir. 1982).

7.      "To determine on appeal whether the ALJ's findings are supported by substantial evidence, a reviewing court considers the whole record, examining evidence from both sides, because an analysis of the substantiality of the evidence must also include that which detracts from its weight."  Williams ex rel. Williams v. Bowen, 859 F.2d 255, 258 (2d Cir. 1988).  If supported by substantial evidence, the Commissioner's finding must be sustained "even where substantial evidence may support the plaintiff's position and despite that the court's independent analysis of the evidence may differ from the [Commissioner's]."  Rosado v. Sullivan, 805 F. Supp. 147, 153 (S.D.N.Y. 1992).  In other words, this Court must afford the Commissioner's determination considerable deference, and may not substitute "its own judgment for that of the [Commissioner], even if it might justifiably have reached a different result upon a *de novo* review."  Valente v. Sec'y of Health & Human Servs., 733 F.2d 1037, 1041 (2d Cir. 1984).

8.      The Commissioner has established a five-step sequential evaluation process to determine whether an individual is disabled as defined under the Social Security Act.  See 20 C.F.R. §§ 404.1520, 416.920.  The United States Supreme Court recognized the validity of this analysis in Bowen v. Yuckert, 482 U.S. 137, 140-142, 107 S. Ct.

2287, 2291, 96 L. Ed. 2d 119 (1987), and it remains the proper approach for analyzing whether a claimant is disabled.

9.      This five-step process is detailed below:

> First, the [Commissioner] considers whether the claimant is currently engaged substantial gainful activity.  If he is not, the [Commissioner] next considers whether the claimant has a "severe impairment" which significantly limits his physical or mental ability to do basic work activities.  If the claimant has such an impairment, the third inquiry is whether, based solely on medical evidence, the claimant has an impairment which is listed in Appendix 1 of the regulations.  If the claimant has such an impairment, the [Commissioner] will consider him disabled with-out considering vocational factors such as age, education, and work experience; the [Commissioner] presumes that a claimant who is afflicted with a "listed" impairment is unable to perform substantial gainful activity.  Assuming the claimant does not have a listed impairment,     the fourth inquiry is whether, despite the claimant's severe impairment, he has the residual functional capacity to perform his past work.  Finally, if the claimant is unable to perform his past work, the [Commissioner] then determines whether there is other work which the claimant could perform.

Berry v. Schweiker, 675 F.2d 464, 467 (2d Cir. 1982) (per curiam); see also Rosa v. Callahan, 168 F.3d 72, 77 (2d Cir. 1999); 20 C.F.R. § 404.1520.

10.     While the claimant has the burden of proof as to the first four steps, the Commissioner has the burden of proof on the fifth and final step.  See Bowen, 482 U.S. at 146 n.5; Ferraris v. Heckler, 728 F.2d 582 (2d Cir. 1984).  The final step of this inquiry is, in turn, divided into two parts.  First, the Commissioner must assess the claimant's job qualifications by considering his physical ability, age, education, and work experience.  Second, the Commissioner must determine whether jobs exist in the national economy that a person having the claimant's qualifications could perform.  See 42 U.S.C. § 423(d)(2)(A); 20 C.F.R. § 404.1520(f); Heckler v. Campbell, 461 U.S. 458, 460, 103 S. Ct. 1952, 1954, 76 L. Ed. 2d 66 (1983).

11.    In this case, the ALJ made the following findings with regard to factual

information as well as the five-step process set forth above: (1) Plaintiff met the

disability insured status requirements of the Act on December 31, 2001, the onset date

of disability, and continued to meet them through the date of the ALJ's decision (R. at

26); (2) Plaintiff has not engaged in substantial gainful activity since May 1999 (R. at

26); (3) Plaintiff had the following severe impairments: bilateral upper extremity

neuropathy status post Neer decompression of both the right and left shoulders with left

shoulder tendinitis/bursitis, left foraminal lateral disc herniation at L5-S1, and residuals

status post acute anterolateral myocardial infarction with two vessel coronary artery

disease; (4) Plaintiff's severe impairments met the duration requirement of the Act, but

did not meet nor equal the medical criteria of any listed impairment or combination of

impairments in Regulations No. 4, Subpart P, Appendix 1 (R. at 26); (5) Prior to

December 31, 2001, Plaintiff's allegations of totally disabling symptoms were not

credible (R. at 26); (6) Commencing on December 31, 2001, Plaintiff has been limited to

standing and walking no more than 2 hours in an 8-hour workday and can lift and carry

at least 10 pounds (R. at 26); (7) Between June 1999 and December 31, 2001, Plaintiff

could sit 6 hours in an 8-hour workday, stand and walk 6 hours in an 8-hour workday, lift

and carry up to 20 pounds occasionally, and had full use of his right upper extremity but

was limited to occasional pushing, pulling, stooping, and reaching with his left upper

extremity (R. at 26); (8) Plaintiff is not able to perform the duties of his prior work (R. at

26); (9) From June 2, 1999 to December 31, 2001, Plaintiff was able to perform the jobs

of mail clerk, messenger, ticket taker, and parking lot attendant (R. at 26); and (10) As

of December 31, 2001, based on Plaintiff's maximum sustained exertional capability for

13

sedentary work, Rule 201.12 applies, directing a decision of disabled (R. at 27).
Ultimately, the ALJ found that Plaintiff met the requirements for disability on December
31, 2001 (R. at 27).

**Plaintiff's Allegations:**

12.    Plaintiff challenges the decision of the ALJ on the basis that it is not supported by
the substantial evidence of record.  Specifically, Plaintiff alleges (1) the ALJ failed to
fully develop the record and follow the treating physician rule when he did not attempt to
obtain from treating physician Dr. Weichert an opinion of Plaintiff's RFC and afforded
the retrospective opinion by treating physician Dr. Desravines "little weight," (2) the
ALJ's credibility assessment did not comply with the appropriate legal standard set forth
in 20 C.F.R. §404.1529 and SSR 96-7p, and erroneously failed to consider Plaintiff's
good work record, and (3) the vocational expert's ("VE") testimony cannot provide
substantial evidence to deny Plaintiff's claim.


**Allegation 1: The ALJ Failed to Fully Develop the Record and Follow the
Treating Physician Rule by a) Not Attempting to Obtain an Opinion of
Plaintiff's RFC from Treating Physician Dr. Weichert, and b) Afforded
Treating Physician Dr. Desravines' Retrospective Opinion "Little Weight":**

**a) Failure to Obtain an RFC or MSS from Treating Physician Dr.
Weichert:**

13.    Plaintiff's first challenge to the ALJ's decision is that (a) the ALJ did not attempt
to obtain from treating physician Dr. Weichert an opinion concerning Plaintiff's RFC and
(b) the ALJ afforded treating physician Dr. Desravines' retrospective opinion "little
weight."  See Plaintiff's Brief, pp. 10-14.  Defendant responds by arguing that Dr.

Weichert's statements were sufficient, thus eliminating the need to re-contact.  See

Defendant's Brief, pp. 5-8.  Defendant also contends that the ALJ's decision to deny Dr.

Desravines' retrospective opinion significant or controlling weight was appropriate

because she was treating Plaintiff for the residuals from his heart attack, but was

making retrospective orthopedic assessments.  Id.

According to the "treating physician's rule,"[30] the ALJ must give controlling weight

to the treating physician's opinion when that opinion is "well-supported by medically

acceptable clinical and laboratory diagnostic techniques and is not inconsistent with the

other substantial evidence in [the] record."  20 C.F.R. § 404.1527(d)(2); see also Green-

Younger v. Barnhart, 335 F.3d 99, 105 (2d Cir. 2003); Shaw v. Chater, 221 F.3d 126,

134 (2d Cir. 2000).

Even if a treating physician's opinion is deemed not to be deserving of controlling

weight, an ALJ may nonetheless give it "extra weight" under certain circumstances.

Under 20 C.F.R. § 404.1527(d)(1)-(6), the ALJ should consider the following factors

when determining the proper weight to afford the treating physician's opinion if it is not

entitled to controlling weight: (1) length of the treatment relationship and the frequency

of examination, (2) nature and extent of the treatment relationship, (3) supportability of

opinion, (4) consistency, (5) specialization of the treating physician, and (6) other factors

that are brought to the attention of the court.  See de Roman, 2003 WL 21511160, at *9

(citing C.F.R. § 404.1527(d)(2)); see also Shaw, 221 F.3d at 134; Clark v. Comm'r of

Soc. Sec., 143 F.3d 115, 118 (2d Cir. 1998).

---

[30] "The 'treating physician's rule' is a series of regulations set forth by the Commissioner in 20 C.F.R. §§ 404.1527 detailing the weight to be accorded a treating physician's opinion." de Roman v. Barnhart, No.03-Civ.0075(RCC)(AJP), 2003 WL 21511160, at *9 (S.D.N.Y. July 2, 2003).

The ALJ has an affirmative duty to develop the record.  Echevarria v. Sec'y of Health & Human Servs., 685 F.2d 751, 755 (2d Cir. 1982).  This duty exists regardless of whether Plaintiff has counsel or is continuing *pro se*. Perez v. Chater, 77 F.3d 41, 47 (2d Cir. 1996).  If the evidence received is not adequate to determine whether an individual is disabled, additional information must be gathered by first re-contacting Plaintiff's treating physician.  20 C.F.R. § 404.1512(e)(1).

"The duty to develop the record is 'particularly important' when obtaining information from a claimant's treating physician due to the 'treating physician' provisions in the regulations." Dickson v. Astrue, No. 1:04-CV-0511, 2008 WL 4287389, at *13 (N.D.N.Y. Sept. 17, 2008) (citing Devora v. Barnhart, 205 F.Supp.2d 164, 172 (S.D.N.Y. 2002)).  Because of this 'particularly important' duty, the ALJ has an affirmative obligation to make reasonable efforts to obtain from Plaintiff's treating physicians any necessary reports, including an assessment of Plaintiff's RFC.  Dickson, 2008 WL 4287389, at *13.  Here, the only opinions that the ALJ had from Dr. Weichert, relating to Plaintiff's RFC, were his statements made on December 6, 2000, that Plaintiff should not "do[] any heavy lifting," as well as those made on November 14, 2001, that Plaintiff should "(1) avoid lifting overhead (2) avoid lifting 20 lbs. [and] avoid sweeping/shoveling" (R. at 376, 379).

The record also indicates that Dr. Weichert was Plaintiff's only orthopedic treating physician for the time period in question.  Because Plaintiff claims he is disabled, in large part, due to his shoulder injuries, Dr. Weichert's opinion of Plaintiff's functional capacity is particularly important.  Therefore, it is recommended that this case be remanded to allow the ALJ an opportunity to obtain Dr. Weichert's opinion as to

Plaintiff's functional limitations for the time period in question, either with an MSS or RFC assessment.

### b) Erroneously Affording "Little Weight" to the Opinions of Dr. Desravines:

Plaintiff also contends that the ALJ should have given treating physician Dr. Desravines' retrospective June 18, 2003 report, controlling or significant weight for the period prior to December 31, 2001.  Defendant responds by arguing that Dr. Desravines was treating Plaintiff only for the residuals from his heart attack, but was making a retrospective orthopedic assessment; thus, the ALJ was correct in affording her opinions "little weight."

Plaintiff began seeing Dr. Desravines on May 9, 2002, five months after his heart attack, as a prerequisite to seeing a cardiologist (R. at 412, 490).  According to the record, Dr. Desravines appears to have largely treated Plaintiff for his cardiac ailments, although there is also mention of treating Plaintiff for his diabetes (R. 412-425).  On June 18, 2003, Dr. Desravines completed a physical MSS that concerned Plaintiff's heart attack on December 31, 2001, and implicitly included Plaintiff's orthopedic problems dating to before his heart attack (R. at 381-385).  Dr. Desravines stated that Plaintiff could stand/walk less than 2 hours in an 8-hour work day, sit at least 6 hours in an 8-hour work day, frequently lift and carry 10 pounds, and rarely stoop or climb (R. at 383, 384).  Dr. Desravines opined that these symptoms had existed since June 23, 2000, encompassing a period prior to the heart attack. (R. at 385).

The ALJ correctly granted Dr. Desravines substantial weight for the time period after Plaintiff's heart attack as Dr. Desravines was Plaintiff's treating physician (R. at

24).  However, the ALJ stated that Dr. Desravines' opinion was entitled to "little weight"
for the period prior to Plaintiff's heart attack.  Id.  Although the Second Circuit has held
that a treating physician's retrospective "opinion is still entitled to significant weight" and
should not be discounted simply because it is retrospective, because the doctor was not
the treating physician for the orthopedic problems and because the opinions were
inconsistent with other medical evidence in the record, as more fully discussed below,
the ALJ was correct in affording Dr. Desravines' opinions "little weight."  Dousewicz v.
Harris, 646 F.2d 771, 774 (2d Cir. 1981)

　　　　For example, according to 20 C.F.R. § 404.1527(d)(2), a treating physician is
entitled to controlling weight when her opinion is "well-supported by medically
acceptable clinical and laboratory diagnostic techniques and is not inconsistent with the
other substantial evidence in [the] record." However, here, Dr. Desravines' June 2003
assessment was inconsistent with other substantial evidence.  Two non-examining
review physicians, Dr. Seok and Dr. Siddiqi, reviewed Plaintiff's medical history on
November 27, 2000, and February 9, 2001, respectively (R. at 207, 244).  Both doctors
found that Plaintiff could lift and/or carry 20 pounds occasionally, lift and/or carry 10
pounds frequently, stand and/or walk about 6 hours in an 8-hour workday and sit about
6 hours in an 8-hour workday (R. at 208, 239).  Both doctors also agreed that Plaintiff
had an unlimited ability to push and/or pull and should limit his climbing and stooping to
occasionally, but Plaintiff had no manipulative, visual, communicative, or environmental
limitations (R. at 209-211, 240-242).

　　　　Also, Dr. Desravines contradicted herself with her June 2003 report.  In her
treatment notes dated June 3, 2002, Dr. Desravines stated that she had filled out a DSS

18

report indicating that Plaintiff "could work full time but no heavy lifting" (R. at 415).  One year later, Dr. Desravines opined that Plaintiff could only stand/walk less than 2 hours in an 8-hour work day, sit at least 6 hours in an 8-hour work day, frequently lift and carry 10 pounds, and rarely stoop or climb (R. at 381, 383, 384).  Dr. Desravines opined that these symptoms existed since June 23, 2000, two years before stating that Plaintiff "could work full time" (R. at 385, 415).  According to 20 C.F.R. § 404.1527(d)(4), a treating physician's consistency must be considered when assigning weight to her opinion.  Generally, the less consistent, the less weight will be afforded.  Id.  Here, because Dr. Desravines' June 2002 treatment notes were inconsistent with other substantial medical evidence, as well as her own June 2003 report, the ALJ was correct in affording her opinions "little weight."

If an ALJ declines to afford a treating physician controlling weight, he must provide "good reasons … for the weight [given a] treating source's opinion." 20 C.F.R. § 404.1527(d)(2); see also Barnett v. Apfel, 13 F. Supp. 2d 312, 316 (N.D.N.Y. 1998) (citing Schisler v. Sullivan, 3 F.3d 563, 567 (2d Cir. 1993)).  Here, the ALJ stated that Dr. Desravines "initially reported that claimant could return to work full time with no heavy lifting…. Subsequently, she provided a medical source statement limiting the claimant to no more than sedentary work" (R. at 24).  Thus, the ALJ articulated his reasoning for granting Dr. Desravines' opinions "little weight."

Also, the ALJ did not have a duty to re-contact Dr. Desravines.  The ALJ does not have a duty to re-contact a treating physician in the event she submits a report inconsistent with other medical evidence, if the evidence the treating source submits as a whole, is complete.  Harvey v. Astrue, No. 5:05-CV-1094, 2008 WL 4517809, at *9

19

(N.D.N.Y. Sept, 29, 2008).  If the record from a treating physician is fully developed, an opinion from that source inconsistent with the other medical evidence on record is an issue of credibility of the treating physician, and is not viewed as an incomplete medical record.  See Rebull v. Massanari, 240 F.Supp.2d 265, 272 (S.D.N.Y. 2002) (holding that the ALJ was not required to re-contact the treating physician for an inconsistent report because the conflict between the treating source's opinion and other medical evidence was "more properly construed as a credibility issue rather than as an issue of the completeness of the administrative record").

Here, the ALJ had a fully developed medical history for Plaintiff from Dr. Desravines and nothing would have been gained by re-contacting her.  Notably, Dr. Desravines had completed an MSS, unlike Dr. Weichert (R. at 381-385).  Also, Dr. Desravines' notes on Plaintiff's treatment were thorough and there do not appear to be any gaps (R. at 412-425).  Therefore, the ALJ did not err in failing to re-contact Dr. Desravines.  In conclusion, the ALJ was correct in his findings on the weight to be giving to Dr. Desravines' various findings.

**Allegation 2: a) The ALJ's Credibility Assessment Did Not Comply with the Appropriate Legal Standard Set Forth in 20 C.F.R. §404.1529 and SSR 96-7p, and b) Erroneously Failed to Consider Plaintiff's Good Work Record**

14.    Plaintiff's second argument is that (a) the ALJ failed to apply the appropriate legal standards in analyzing Plaintiff's contention of pain and (b) the ALJ failed to include Plaintiff's good work history in the ALJ's credibility analysis.  Defendant contends that

the medical evidence does not support Plaintiff's claim of total disability prior to

December 31, 2001.  See Defendant's Brief, pp. 8-11.

### a) Plaintiff's Contention of Pain:

"An administrative law judge may properly reject claims of severe, disabling pain

after weighing the objective medical evidence in the record, the claimant's demeanor,

and other indicia of credibility, but must set forth his or her reasons with sufficient

specificity to enable us to decide whether the determination is supported by substantial

evidence."  Lewis v. Apfel, 62 F.Supp.2d 648, 651 (N.D.N.Y. 1999) (internal citations

omitted).   Thus, the ALJ must follow a two-step process to evaluate Plaintiff's

contention of pain, set forth in SSR 96-7p, 1996 WL 374186, at *2:

> First, the adjudicator must consider whether there is an
> underlying medically determinable physical or medical impairment
> (s) … that could reasonably be expected to produce the individual's
> pain or other symptoms….
> Second, … the adjudicator must evaluate the intensity,
> persistence, and limiting effects of the individual's symptoms to
> determine the extent to which the symptoms limit the individual's
> ability to do basic work activities….

According to 20 C.F.R. § 404.1529(c)(3)(i)-(vii), if Plaintiff's pain contentions are

not supported by objective medical evidence, the ALJ must consider the following

factors in order to make a determination of Plaintiff's credibility concerning his pain:

1. [Plaintiff's] daily activities;
2. The location, duration, frequency and intensity of [Plaintiff's] pain or other symptoms;
3. Precipitating and aggravating factors;
4. The type, dosage, effectiveness, and side effects of any medication [Plaintiff] take[s] or ha[s] taken to alleviate … pain or other symptoms;
5. Treatment, other than medication [Plaintiff] receive[s] or ha[s] received for relief of … pain or other symptoms;

6. Any measure [Plaintiff] use[s] or ha[s] used to relieve … pain
or other symptoms;

7. Other factors concerning [Plaintiff's] functional limitations
and restrictions due to pain or other symptoms.

If the ALJ finds Plaintiff's pain contentions not credible, he must state his reasons "explicitly and with sufficient specificity to enable the Court to decide whether there are legitimate reasons for the ALJ's disbelief." Young v. Astrue, No. 7:05-CV-1027, 2008 WL 4518992, at *11 (N.D.N.Y. Sept. 30, 2008) (quoting Brandon v. Bowen, 666 F.Supp 604, 608 (S.D.N.Y. 1987)). Here, the ALJ stated he considered Plaintiff's pain according to SSR 96-7p and 20 C.F.R. §416.929, but he did not give his specific reasoning as to why he found Plaintiff's contention not credible before December 31, 2001 (R. at 25). The ALJ merely stated that "[g]iven the claimant's limited activities, clinical findings, medical treatment, and the various assessments in the record by medical personnel, the claimant's allegations of disabling symptoms are credible, but only as to the period on and after December 31, 2001." Id. This statement is conclusory and is thus insufficient in specificity under the regulations to support the ALJ's finding. See Gladding v. Comm'r of Soc. Sec., No. 7:05-CV-1505, 2008 WL 4104690, at *9 (N.D.N.Y. Sept. 3, 2008) (finding that the ALJ's analysis was insufficient because he failed to assess the first step of the two-step process set forth in SSR 96-7p as well as fully discuss the factors in 20 C.F.R. § 404.1529(c)(3)(i)-(vii)); Fox v. Astrue, No. 6:05-CV-1599, 2008 WL 828078, at *14 (N.D.N.Y. March 26, 2008) (remanding the case, in part, because the ALJ failed to explicitly discuss the factors set forth in 20 C.F.R. § 404.1529(c)(3)(i)-(vii)).

**(b) Plaintiff's Work History:**

22

Plaintiff also argues that the ALJ failed to take into account Plaintiff's good work history.  "A claimant with a good work record is entitled to substantial credibility when claiming an inability to work because of a disability."  Rivera v. Schweiker, 717 F.2d 719, 725 (2d Cir. 1983).  In assessing the credibility of a Plaintiff's contention of pain, the ALJ is told to consider, among other things, "prior work record and efforts to work." SSR 96-7p, 1996 WL 374186, at *5.  Here, the ALJ did not appear to take into consideration Plaintiff's near 27 year work history, other than to briefly mention that Plaintiff stopped working in May 1999, when the factory he was employed at closed (R. at 85, 22).  Therefore, it is recommended that this case be remanded in order to allow the ALJ an opportunity to state the basis for his findings and to take into consideration Plaintiff's work history.

### Allegation 3: The Vocational Expert's Testimony Cannot Provide Substantial Evidence to Deny Plaintiff's Claim

15.    Plaintiff's third argument is that (a) the VE was not qualified because she had no independent knowledge of the numbers of jobs available, (b) the VE's testimony was inconsistent with the Dictionary of Occupational Titles ("DOT") and Selected Characteristics of Occupational Titles ("SCO"), and (c) the hypothetical given to the VE was incomplete.  See Plaintiff's Brief, pp. 14-17.  Defendant responds by arguing that the VE's testimony was not inconsistent with the DOT and that the VE is not required to know the methodology of how the numbers are derived.  See Defendant's Brief, pp. 11-14.

### (a) VE Not Qualified:

Plaintiff contends that the VE was not qualified to make a determination of the number of jobs available to Plaintiff because she was not aware of the methodology used to derive those numbers.  The VE stated that she obtained the numbers pertaining to Plaintiff from the New York State Department of Labor and the United States Bureau of Labor Statistics (R. at 474).  If the issue is whether a plaintiff is disabled or whether work skills can be used in other work and the specific occupations in which they can be used, or there is a similarly complex issue, the services of a VE or other specialist can be employed.  20 C.F.R. § 404.1566(e).  Here, the ALJ needed to determine whether there were significant job opportunities for an individual with Plaintiff's RFC.  It was therefore reasonable for the ALJ to employ the services of a VE.  Having done so, the ALJ took "administrative notice of reliable job information available from various governmental and other publications" including the DOT published by the Department of Labor.  20 C.F.R. § 404.1566(d) utilized by the VE.  In accordance with principles of administrative notice, it was thus unnecessary for the VE to have specific knowledge of the methodology of the studies utilized.  The Court recommends that this claim be denied.

### (b) VE's Testimony Inconsistent with the DOT:

Plaintiff also argues that the VE's testimony was inconsistent with the DOT and SCO.  However, Plaintiff did not raise this argument to the ALJ despite questioning the VE at length (R. at 473-488).  Therefore, it is recommended that this argument be dismissed.  See, Harvey v. Astrue, No. 5:05-CV-1094, 2008 WL 4517809, at *15 (N.D.N.Y. Sept. 29, 2008) (forfeiting Plaintiff's objection as to the basis of the VE's

24

testimony because Plaintiff failed to raise the objection until the appeal).  This claim should also be denied.

### (c) Incomplete Hypothetical:

The VE was restricted to finding those jobs with "occasional pushing, pulling, stooping and reaching" in Plaintiff's left upper extremity but the ALJ did not give the VE any restrictions for Plaintiff's right upper extremity (R. at 25).  The VE responded with four appropriate jobs from the DOT: mail clerk, messenger, ticket taker, and parking lot attendant.  Id. Plaintiff contends that the hypothetical given to the VE was incomplete. Specifically, Plaintiff argues that substantial medical evidence supports the claim that Plaintiff was also disabled in his right shoulder and could therefore do less than frequent reaching with his right arm.  Hence, this limitation should have been given to the VE in her assessment of the available jobs.

However, because the ALJ erred in failing to obtain an RFC or an MSS from Dr. Weichert by re-contacting him to obtain such a report, the Plaintiff's treating Physician, the ALJ deprived himself of the necessary facts to construct an appropriate hypothetical, as discussed in Plaintiff's First Allegation above.  Consequently, it is recommended that the case be remanded to allow the ALJ to reassess the hypothetical given to the VE.

## Conclusion

Based on the foregoing, it is recommended that Defendant's motion for judgment on the pleadings should be DENIED; Plaintiff's cross motion for judgment on the pleadings should be DENIED in part and GRANTED in part and REMANDED for reconsideration.

25

Respectfully submitted,

Victor E. Bianchini
United States Magistrate Judge


DATED:        November 20, 2008
              Syracuse, New York

## ORDERS

Pursuant to 28 U.S.C. § 636(b)(1), it is hereby


**ORDERED** that this Report and Recommendation be filed with the Clerk of the Court.


        **ANY OBJECTIONS** to this Report and Recommendation must be filed with the

Clerk of the Court within ten (10) days of receipt of this Report and Recommendation in

accordance with the above statute, Rules 72(b), 6(a) and 6(e) of the Federal Rules of

Civil Procedure and Local Rule 72.3.

**Failure to file objections within the specified time or to request an**

**extension of such time waives the right to appeal the District Court's Order.**

 *Thomas v. Arn,* 474 U.S. 140, 106 S.Ct. 466, 88 L.Ed.2d 435 (1985);   *Small v.*

*Secretary of Health and Human Services,* 892 F.2d 15 (2d Cir.1989);   *Wesolek v.*

*Canadair Limited,* 838 F.2d 55 (2d Cir.1988).

Let the Clerk send a copy of this Report and recommendation to the attorneys for

the Plaintiff and the Defendants.

SO ORDERED.

Victor E. Bianchini
United States Magistrate Judge


DATED:        November 20, 2008
                     Syracuse, New York

27